**SO ORDERED.**

**SIGNED this 30 day of April, 2007.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| **LARRY EUGENE MINER and** | ) | |
| **CLARICE ANNE MINER** | ) | **Case No. 03-42802** |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| _____ | ) | |
| **LARRY EUGENE MINER,** | ) | |
| **CLARICE ANNE MINER, and** | ) | |
| **JAN HAMILTON, Trustee** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Adversary No. 05-7119** |
| | ) | |
| **BENEFICIAL MORTGAGE** | ) | |
| **COMPANY OF KANSAS, INC.** | ) | |
| | ) | |
| Defendant. | ) | |
| _____) | | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART, AND DENYING IN PART, BENEFICIAL MORTGAGE COMPANY OF KANSAS, INC.'S MOTION FOR SUMMARY JUDGMENT

This adversary proceeding is before the Court on Defendant's Motion for Summary Judgment.[1] It is related to the Plaintiffs' bankruptcy proceeding and all parties have consented to the trial and entry of a final order by the Bankruptcy Court.[2] Therefore, the Court has jurisdiction to hear this matter.[3] For the reasons stated below, the Court grants the Defendant's motion, in part, and denies it in part.

## I.   FINDINGS OF FACT

Larry and Clarice Miner (the "Miners") initiated this adversary proceeding bringing numerous claims against Beneficial Mortgage Company of Kansas ("Beneficial") concerning a series of consumer loan transactions between the parties. On January 10, 2000, the Miners borrowed $3,661.98 from Beneficial and executed a Loan Repayment Agreement and Security Agreement (the "January 2000 Loan"). The January 2000 Loan was a personal loan with an interest rate of 26.086%; it included an origination fee of $71.80. The Miners also purchased credit life and credit disability insurance as part of that transaction.

On March 12, 2001, the Miners borrowed $37,536.00 from Altegra Credit Company and executed a Note secured by a Mortgage on their residence at 2515 SE Maryland Avenue, Topeka, Kansas (the "Altegra Loan"). The thirty-year Altegra Loan had an interest rate of 8.69%. As part of their Altegra Loan application, the Miners valued their home at $52,000. The Altegra Loan was used, in part, to pay off the January 2000 Loan to Beneficial, and the

---

[1]Doc. 60.

[2]See Final Pretrial Order, Doc. 52, Section 2.

[3]28 U.S.C. § 157(c).

Miners received a pro rata credit for the insurance premiums paid for credit life and credit disability insurance coverage related to the January 2000 Loan.

On September 28, 2001, the Miners borrowed $10,549.40 from Beneficial and executed a Loan Repayment Agreement and Security Agreement (the "September 2001 Loan"). The September 2001 Loan was a personal loan that had an interest rate of 22.776% and an origination fee of $100. The Miners also purchased credit life and credit disability insurance in connection with this loan.

Less than four months later, on January 16, 2002, the Miners borrowed another $4,395.00 from Beneficial to finance the purchase of a water softener through GE Ion (the "GE Ion Loan"). The GE Ion Loan had an interest rate of 17.998% and was for a term of 60 months. The GE Ion Loan did not include a prepaid finance charge or any points.[4]

The next day, on January 17, 2002, the Miners met with Erin Musil, a Beneficial sales associate, about refinancing and consolidating their outstanding debts. The Miners' goal in refinancing was to reduce their total monthly debt obligation and to reduce the number of creditors to whom they were required to make monthly payments. As a result of this meeting, Ms. Musil provided the Miners with a loan proposal that included both the refinance of the Altegra Loan and a new home equity line of credit with Beneficial (the "Loan Proposal"). The Loan Proposal provided for a first mortgage loan in the principal amount of $64,681.29 with interest at 11.44% and points of 4.76% on the principal amount of the

---

[4]"Points" are fees paid up front to a lender at the time of closing that reduce the interest rate applicable to a loan. One point is equal to 1% of the loan amount.

3

loan. Ms. Miner wrote on the Loan Proposal "House app $60,000," which this Court interprets to mean that Ms. Miner then valued her home at approximately $60,000.

On that same day, Beneficial provided the Miners with a Good Faith Estimate of the costs they would incur at closing on the proposed first mortgage loan, as well as a document entitled RIGHT TO RECEIVE COPY OF APPRAISAL. An appraisal conducted for Beneficial on January 23, 2002 by Diebold Appriasal Services, Inc. confirmed the $60,000 value. It is Beneficial's ordinary practice to reveal the results of such an appraisal to the property owner before closing on a mortgage transaction.

Subsequent to January 17, 2002, but prior to closing the proposed loans, Beneficial approved the Miners for a first mortgage loan in the amount of $73,051.39 as well as a home equity line of credit of $15,000. It is also Beneficial's practice to communicate the loan approvals to the borrower prior to any closing. On January 26, 2002, the Miners borrowed $73,051.39 from Beneficial and executed a Loan Repayment and Security Agreement secured by a mortgage on their home (the "First Mortgage Loan"). The amount actually financed for the First Mortgage Loan was $69,574.14. Some of the costs and expenses for the First Mortgage Loan, including the points and the state mortgage tax, were greater than those disclosed on the Good Faith Estimate due to the fact that the Miners increased the principal amount borrowed. However, neither the interest rate of 11.44%, nor the points percentage of 4.76%, increased from the Loan Proposal provided by Beneficial. The First Mortgage Loan has an interest rate of 11.447% with a 15 year term.

4

The Miners were charged $3,477.25 as points on the First Mortgage Loan, which equals 4.76% of the principal amount, or 4.99% of the amount financed. The First Mortgage Loan permits a late charge equal to 10% of the monthly payment, or $29, whichever is greater, if payment in full is not received within 15 days of its due date. A late charge is not imposed more than one time for a late payment of the same installment, and Beneficial does not deduct late charges from the regular installment payments it receives.

The First Mortgage Loan also provided for a prepayment penalty, equal to six months of interest at the contract amount on the original amount financed, if the loan was paid off during the first three years with funds from a source other than Beneficial. The prepayment penalty was disclosed to the Miners in the Loan Repayment and Security Agreement for the First Mortgage Loan, and they have not been charged with any prepayment penalties in connection with that loan. The loan agreement for the First Mortgage Loan provides that the interest rate may be adjusted by 0.5% at the end of the third, fourth and fifth years of the repayment period if all payments are made within 30 days of their due date and bankruptcy is not filed during that time frame.

Although the Miners did not choose to review the First Mortgage Loan documents at closing, or anytime thereafter, and neither recall raising any questions or issues regarding their First Mortgage Loan at the closing on January 26, 2002, the loan agreement drafted by Beneficial provides under "APPLICABLE LAW" that the First Mortgage loan is "made under the Kansas Uniform Consumer Credit Code, Sections 16a-101 to 16a-9-102, and, more particularly, at the rate authorized by K.S.A. 16a-2-401." It further provides that the

5

agreement "also qualifies as an 'alternative mortgage transaction' under the Alternative Mortgage Transaction Parity Act section of the Garn-St. Germain Depository Institutions Act of 1982, Sections 3801 through 3806, Title 12, U.S.C." In addition, the billing statements for the First Mortgage Loan reflect that the loan is made "PURSUANT TO THE ALTERNATIVE MORTGAGE TRANSACTION PARITY ACT," and that the Miners "WILL BE ASSESSED THE LATE CHARGE STATED IN YOUR LOAN AGREEMENT IF YOUR PAYMENT IS MADE 15 DAYS OR MORE AFTER THE PAYMENT DUE DATE SHOWN ABOVE."

The First Mortgage Loan paid off several of the Miners' outstanding debts, including the Altegra Loan in the amount of $36,731.11, Beneficial's September 2001 loan in the amount of $7,529.91, Beneficial's GE Ion Loan in the amount of $4,427.96, a medical debt in the amount of $1,500.00, a First Bankcard Visa credit card in the amount of $2,427.00, two Sears accounts totaling $4,039.00, and a JC Penny account in the amount of $114.00. The Miners received $2,257.55 in cash back from the First Mortgage Loan, and also received a pro rata credit for the insurance premiums paid for credit life and credit disability insurance coverage for repaying the September 2001 Loan to Beneficial.

The monthly payment on the First Mortgage Loan is $850.91 over a term of 15 years. Prior to the January 26, 2002 refinance with Beneficial, the Miners' monthly house payment with Altegra was less than half of that---$373.82; they had approximately 29 years remaining on that loan. The $850.91 payment, however, eliminated over $670 per month in payments required on the following approximate obligations:

6

1) $50 per month on their First Bankcard Visa credit card (19.99% interest rate);

2) $18 per month on the JC Penny account (24.99% interest rate);

3) $150.00 per month total on their two Sears accounts (21.90% interest rate);

4) $50 per month on their medical debt;

5) $294 and $111.60, respectively, on the Beneficial September 2001 Loan and Loan (at 22.77% and 17.99% interest).

As part of the First Mortgage Loan transaction, the Miners purchased credit life insurance and credit disability insurance for $7,175.11 and $2,399.57, respectively. Neither of these insurance products were required as a condition of the First Mortgage Loan. At closing, the Miners signed and received a disclosure regarding the optional credit insurance they were purchasing (the "CE Optional Credit Insurance Disclosure"). As part of that disclosure, the Miners were advised that "**CREDIT INSURANCE IS OPTIONAL AND NOT REQUIRED TO OBTAIN THIS LOAN**." They were also advised of the cost and coverage of each insurance product.

The Miners signed the CE Optional Credit Insurance Disclosure form at the January 26, 2002 closing. The Customer Satisfaction Survey related to the First Mortgage Loan, which the Miners signed at that closing, indicates that the Miners understood that Beneficial did not require the purchase of credit insurance in order to receive a loan. The Customer Satisfaction Survey also provides that the First Mortgage Loan met the two goals stated by the Miners – to reduce their total monthly payments and to reduce the number of creditors to whom they had to make payments each month.

7

On January 26, 2002, the same date they executed the note and mortgage documents to borrow the $73,057, the Miners borrowed an additional $13,500 from Beneficial. They executed a Home Equity Credit Line Revolving Loan Agreement secured by a second mortgage on their home (the "Second Mortgage Loan")—so over $86,500 debt against a house worth no more than $60,000. The Second Mortgage Loan had an annual percentage rate of 18% and was for a term of 15 years. The Second Mortgage Loan refinanced the Miners' outstanding secured debt with Ford Motor Credit Company ($12,661.00). Prior to refinancing the car, the Miners' monthly loan payment to Ford Motor Credit was $465.56, with a remaining term of approximately two years. The initial monthly loan payment on the Second Mortgage Loan was $253.00, with a term of 15 years.

On March 1, 2002, Household Insurance Services notified the Miners that their application for credit life and credit disability insurance, purchased as part of the First Mortgage Loan Transaction, had been declined. On March 4, 2002, Beneficial mailed a $9,574.68 check to the Miners; this represented the refund of premiums paid for these insurance products related to the First Mortgage Loan (the "Insurance Refund"). The Miners immediately endorsed the Insurance Refund check and deposited it in their checking account. The Miners did not choose to apply any of the Insurance Refund to the outstanding balance of their First Mortgage Loan, other than to make some of their regular monthly mortgage payments. The Miners withheld $574.68 cash from the Insurance refund at the time they deposited the check in their checking account; they do not recall how that $574 was spent.

8

The Miners made the following purchases with the proceeds of the Insurance Refund: carpet for their home, a truck bed cover for Mr. Miner's truck, a detached two-car carport for their home, a camcorder, and a humidifier. In addition, they used a portion of the Insurance Refund to pay off $514.46 in new charges they had incurred on their JC Penny card since the account was paid in full by the First Mortgage Loan. The Miners also used the Insurance Refund to make two payments, one for $568.26 on March 10, 2002 and the other one for $500 on April 7, 2002, towards new charges made on their First Bankcard Visa credit card. This account had also been paid in full by the First Mortgage Loan. The Miners also made several cash withdrawals, totaling $600, from their checking account during the next two months. Finally, between the date the Miners closed on the First Mortgage Loan, January 26, 2002, and the date the Miners filed for Chapter 13 bankruptcy, September 23, 2003, they incurred $19,525.23 in new unsecured credit card debt, despite having essentially the same income during that period.

The Miners have a demonstrated history of purchasing credit insurance. They voluntarily purchased insurance protection for their JC Penny Account, their Capital One account, both of their Sears accounts, and both of their First Bankcard Visa credit accounts. This insurance was purchased in case Mr. Miner was injured at work. The family relies on his income because Ms. Miner is disabled from working.

The Miners retained Charles E. Merritt III as an expert witness in this case. Mr. Merritt has opined that Beneficial engaged in improper lending practices by, *inter alia*, engaging in a series of loan transactions with the Miners over a short period of time in an

9

effort to increase the amount of fees and costs generated by each loan, which is a practice he calls "loan flipping."

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[5] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[6] An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[9] In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial need not

---

[5]Fed. R. Civ. P. 56(c). Fed. R. Civ. P. 56(c) is made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7056.

[6]*Lifewise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir. 2004); *Loper v. Loper (In re Loper)*, 329 B.R. 704, 706 (10th Cir. BAP 2005).

[7]*Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[8]*Id.* (citing *Anderson,* 477 U.S. at 248).

[9]*Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

10

negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[10]

If the movant carries this initial burden, the nonmovant who would bear the burden of persuasion at trial may not simply rest upon his pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[11] To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12] Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## III.   ANALYSIS

Beneficial moves for summary judgment on each of the nine claims preserved by the Miners in the Pretrial Order.[14]

―――――――――――――

[10]*Id.* (citing *Celotex,* 477 U.S. at 325).

[11]*Id.* (citing Fed. R. Civ. P. 56(e)).

[12]*Diaz v. Paul J. Kennedy Law Firm,* 289 F.3d 671, 675 (10th Cir. 2002).

[13]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14]For the benefit of the parties, the Court's analysis will follow the order in which the parties organized their arguments in the summary judgment motion, rather than addressing each cause of action sequentially.

11

**A.** **Beneficial is entitled to summary judgment on the Miners' first theory of recovery for violation of the Kansas Consumer Credit Code based on an excessive prepaid finance charge.**

The Miners allege that the prepaid finance charges Beneficial charged at the closing of the First Mortgage Loan exceed the amount allowed by § 16a-2-401(6) of the Kansas Consumer Credit Code ("KCCC").[15]  KCCC § 16-a-2-401 states, in part:

> (6) Prepaid finance charges on consumer loans are limited as follows:
>
> (a) For a consumer loan secured by a first mortgage or a second mortgage, …, prepaid finance charges in an amount not to exceed 8% of the amount financed may be charged, provided that the aggregate amount of prepaid finance charges payable to the lender or any person related to the lender do not exceed 5% of the amount financed.
>
> (b) for any other consumer loan, prepaid finance charges in an amount not to exceed the lesser of 2% of the amount financed or $100 may be charged.
>
> ***
>
> (9) If, within 12 months after the date of the original loan, a lender or a person related to the lender refinances a loan with respect to which a prepaid finance charge was payable to the same lender pursuant to subsection (6), then the following apply:
>
> (a) If a prepaid finance charge with respect to the original loan was payable to the lender pursuant to paragraph (a) of subsection (6), then the aggregate amount of prepaid finance charges payable to the lender or any person related to the lender with respect to the new loan may not exceed 5% of the additional amount financed.

---

[15]Beneficial concedes that this loan would qualify as a "consumer loan" governed by the KCCC, despite the fact it is actually a first mortgage loan, because the loan-to-value ratio of the loan at the time of closing exceeds 100% – the principal amount of the loan was $73,051.39 compared to the property value of no more than $60,000.

12

(b) If a prepaid finance charge with respect to the original loan was payable to the lender pursuant to paragraph (b) of subsection (6), then the aggregate amount of prepaid finance charges payable to the lender or any person related to the lender with respect to the new loan may not exceed the lesser of 2% of the additional amount financed or $100.[16]

According to the Miners, § 16a-2-401(9) was added in 1999 in an effort to curb "loan flipping," which is described as quick, repeated refinancing of a consumer loan that is often accompanied by significant prepaid finance charges.

The Miners first claim that Beneficial has violated § 16a-2-401(6)(a) because the prepaid finance charges exceeded 5%. The Miners claim that the premiums paid for the credit life and credit disability insurance should be included in the amount of prepaid finance charges, which would push the amount over the 5% limit.

The definition of "prepaid finance charges" is "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time. Prepaid finance charges shall be calculated as provided in rules and regulations adopted by the administrator pursuant to K.S.A. 16a-6-117, and amendments thereto."[17] K.S.A. 16a-6-117 directs the administrator to "adopt rules and regulations necessary to carry out the provisions and terms of the uniform consumer credit code which are consistent with or no less restrictive than the truth-in-lending act, which is contained in title I of the consumer credit protection act, 15 U.S.C. § 1601 *et seq*. and regulation Z, 12 C.F.R. § 226 *et seq.*, as amended."

---

[16]K.S.A. 16a-2-401.

[17]K.S.A. 16a-1-301(35).

13

The Kansas administrative regulations mandated by K.S.A. 16a-6-117 provide that "[t]he term 'finance charge' and 'prepaid finance charge,' as used in the Kansas uniform consumer credit code, shall have substantially the same meanings given to those terms in, and shall be calculated in a manner that conforms to the following: (1) Title I of the consumer credit protection act, 15 U.S.C. § 1601 *et seq.*, as amended, and in effect on January 1, 2000; and (2) regulation Z, 12 C.F.R. part 226, *et seq*., including all appendices, as amended and in effect on March 31, 2000."[18]   The Truth in Lending Act and Regulation Z exclude insurance premiums from the calculation of prepaid finance charges when certain conditions are met: (1) insurance coverage is not required and that fact is disclosed to the borrower in writing; (2) the premium for the initial term of the insurance is disclosed and the term of the insurance is disclosed; and (3) the consumer signs or initials an affirmative written request for insurance after receiving the above referenced disclosures.

The Miners do not controvert either that they were informed in writing that the insurance coverage was not required, or that they signed an affirmative written request for the insurance.  The Miners do, however, attempt to claim that the actual term of the insurance was not disclosed to them.  The Court finds that the term of the insurance was in fact disclosed, and that the requirements to exclude the insurance premiums from the prepaid finance charges calculation were met.

---

[18]K.A.R. § 75-6-26(c).

14

First, in its memorandum in support of its motion for summary judgment, Beneficial clearly sets forth a properly supported statement of fact that "[a]s part of the CE Optional Credit Insurance Disclosure, the Miners were advised of the cost of the credit life and credit disability insurance <u>and the term of coverage for both</u>."[19]  The Miners did not controvert this statement of fact set forth by Beneficial, and it is thus deemed admitted for purposes of this summary judgment motion.[20]

Despite this admission, the Miners contend that "[i]n the Credit Life Insurance section of the contract, it states that the agreement 'provides life insurance for your account as long as you pay the monthly insurance charge and as long as there is an outstanding balance on your account.'  However, that statement is incorrect."  The Miners then go on to claim that the insurance contract states that the insurance will terminate when an insured debtor reaches the age of 66.  The Miners do not cite to the record to support this assertion, and Beneficial specifically denies that this language is included in any document in the record before the Court.  Further, the Court has independently reviewed the CE Optional Credit Insurance Disclosure form and finds that it clearly sets forth the term for the insurance.

The Court finds that the Miners' failure to cite to any evidence in the record to support their claim that the term of the insurance was not properly disclosed, coupled with their failure to controvert Beneficial's properly supported statement of fact that is directly to the contrary and the Court's own review of the disclosure statement, necessitates a finding that

---

[19]See Doc. 60 at p. 59, Statement of Fact No. 86.

[20]D. Kan. LBR 7056.1(a).

15

the proper disclosure of the term of the insurance was made. As such, the cost for the credit life insurance and the credit disability insurance are not included in the calculation of the prepaid finance charges in the First Mortgage Loan transaction.

The Miners also claim that Beneficial violated § 16a-2-401(9), which regulates refinancing by the same lender within 12 months. The Miners contend that because the First Mortgage Loan was used to pay off the personal loans they had so recently taken out with Beneficial, the Court should apply the provisions of § 16a-2-401(9), which would limit the amount of prepaid finance charges Beneficial could charge on the mortgage loan to prevent Beneficial from engaging in "loan flipping."

The Court finds that the Miners' position is not supported by the language of the KCCC. K.S.A. 16a-2-401(9) clearly distinguishes between consumer loans that are secured by a mortgage and all other consumer loans. Subsection (a) deals with those situations where the prepaid finance charges paid in connection with the initial loan involved a debt that was secured by a home mortgage, while subsection (b) applies to all other instances involving prepaid finance charges. Because the initial loans by Beneficial to the Miners were personal loans, and the subsequent loan at issue in this case was secured by a mortgage, the Court finds that K.S.A. 16a-2-201(9) is not applicable.

Based upon the foregoing, the Court finds that Beneficial is entitled to summary judgment, as a matter of law, on the Miners' first theory of recovery for violation of the Kansas Consumer Credit Code.

16

**B.**     **Beneficial is not entitled to summary judgment on the Miners' second and third theories of recovery because Beneficial chose to be governed by the Kansas Consumer Credit Code.**

The Miners, in their second theory of recovery, claim that Beneficial's mortgage violated the KCCC by providing that the Miners would be charged a prepayment penalty if they paid off their mortgage early. The third theory of recovery is based on a claim that Beneficial violated the KCCC by charging the Miners excessive late fees with respect to the First Mortgage. Beneficial does not deny that the contract provisions governing the prepayment penalty and the late fees violate the KCCC. Instead, it argues that the Federal Alternative Mortgage Transaction Parity Act ("AMTPA")[21] preempts the KCCC, leaving the Miners with no cause of action under the KCCC.

The AMTPA was enacted in 1982 to encourage state-chartered lenders to make alternative mortgage transactions,[22] and to provide a more level playing field for state-chartered lenders.[23] Although federally chartered lenders had the freedom to enter into alternative mortgages, many state-chartered lenders were prohibited from extending this type of credit under applicable state law. The AMTPA's purpose is to "eliminate the discriminatory impact that those [state] regulations have upon nonfederally chartered housing

---

[21]12 U.S.C. § 3801, et seq.

[22]Alternative mortgages are mortgages in which the interest rate or finance charge may be adjusted or renegotiated, the debt maturity date may be shortened, or other variations uncommon to traditional fixed-rate, fixed-term transactions. *McCarthy v. Option One Mortg. Corp.*, 362 F.3d 1008, 1010-11 (7th Cir. 2004).

[23]12 U.S.C. § 2801(b).

17

creditors and provide them with parity with federally chartered institutions."[24]  If a housing

lender elects to be governed by federal law, and complies with the requirements of federal

law, then any state law governing the mortgage transaction is preempted.[25]  At issue in this

case is whether Beneficial elected to be governed by federal law in connection with the First

Mortgage Loan transaction, or whether it opted to be governed by the KCCC.  If Beneficial

elected to be governed by the KCCC, then it is bound by the state law, and the Miners have

stated a viable cause of action.[26]

_____

[24]*Id.*

[25]*McCarthy*, 362 F.3d at 1011 (holding "the Illinois Interest Act's prohibition of prepayment penalties is preempted if a non-federal housing creditor elects to be governed by and complies with federal law") and *National Home Equity Mortg. Ass'n v. Face* 239 F.3d 633, 640 (4th Cir. 2001) (holding "non-federally chartered housing creditors in Virginia . . . may elect to have their alternative mortgage transactions governed by the federal law applicable to federally chartered housing creditors engaging in similar transactions by complying with that law, and when they do, that law, . . . , preempts Virginia [law] . . . which limits the imposition of prepayment penalties.").

[26]Beneficial claims in its reply that even if its contract provides that the KCCC shall govern, such contract language is in itself preempted by federal law.  In support of this claim, Beneficial cites a case in which the Court of Appeals for the Tenth Circuit refused to find that a choice of laws provision that required the application of New York law to a contract overrode the preemptive effect of the Federal Arbitration Act.  *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956 (10th Cir. 2001), *rev'd*, 537 U.S. 79 (2002).  The Court finds, however, that both the language of the AMTPA, as well as the cases that have interpreted it since its passage, clearly indicate that a housing lender has the option of electing whether to be governed by federal law or by state law and that the benefits of federal preemption are elective by the lender.  *See, e.g. McCarthey*, 362 F.3d at 1011 (holding that Illinois state law is preempted "if a non-federal housing creditor <u>elects to be governed by</u> and complies with federal law) (emphasis added), *Face*, 239 F.3d at 640 (holding that "non federally chartered housing creditors in Virginia . . . <u>may elect to have their alternative mortgage transactions governed by the federal law</u> applicable to federally chartered housing creditors") (emphasis added), and 12 U.S.C. § 3803(c) (stating that "An alternative mortgage transaction <u>may</u> be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law or regulation.") (emphasis added).

18

The loan agreement for the First Mortgage Loan provides, under a paragraph labeled "APPLICABLE LAW," that the loan is "made under the Kansas Uniform Consumer Credit Code, Sections 16a-101 to 16a-9-102, **and, more particularly, at the rate authorized by K.S.A. 16a-2-401.**"[27] It further provides that the agreement "also qualifies as an 'alternative mortgage transaction' under the Alternative Mortgage Transaction Parity Act section of the Garn-St. Germain Depository Institutions Act of 1982, Sections 3801 through 3806, Title 12, U.S.C."

Based upon the contract language Beneficial draft, Beneficial specifically made itself subject to the KCCC, thus opting out of the preemptive effect of the AMTPA. The Court recognizes that the mortgage does state that the agreement <u>qualifies</u> as an alternative mortgage under the AMTPA, but does not indicate that the transaction will be <u>governed</u> by federal law, as it expressly does with regard to the KCCC.

At most, the specific reference to the AMTPA later in the contract, after specifically stating that the loan was being made pursuant to the KCCC, creates an ambiguity in the contract between Beneficial and the Miners. This leads the Court to the same end, because "[i]f the meaning is ambiguous, the contract must be construed against the drafter."[28] Therefore, even if the Court were to find it ambiguous whether Beneficial was electing to be

---

[27]Emphasis added.

[28]*Liggatt v. Employers Mut. Cas. Co.*, 273 Kan. 915, 921 (2002). *See also, Shelter Mut. Ins. Co. v. Williams*, 248 Kan. 17, 23 (1991) ("In construing contracts, an ambiguity in the language of the contract will be strictly construed against the party who drafted the provision.").

19

governed by state law or federal law, the fact that Beneficial drafted the contract in question requires a finding that it elected to be governed by the KCCC.

Having determined that Beneficial elected to be governed by the KCCC in connection with this mortgage transaction, the Court finds that Beneficial is not entitled to summary judgment on the Miners' second and third theories of recovery.

**C.    Beneficial is entitled to summary judgment on the Miners' fourth theory of recovery because the Miners do not have a private cause of action for unconscionability under the KCCC.[29]**

The Miners' fourth theory of recovery is based upon a claim of unconscionability under K.S.A. 16a-5-108.  The Miners claim that the First Mortgage Loan is unconscionable under § 16a-5-108 of the KCCC on three separate bases: 1) monthly payments exceeded the Miners' ability to pay; 2) the loan paid off unsecured obligations with shorter repayment periods; and 3) the loan paid off debts owed to Beneficial from recent transactions, which the Miners contend constituted "loan flipping."

Beneficial claims that the Miners do not have a private cause of action for unconscionability under K.S.A. 16a-5-108, relying on *Gonzalez v. Associates Financial Services Company of Kansas, Inc.*.[30]  In *Gonzalez*, the Kansas Supreme Court clearly held

---

[29]Beneficial also moved for summary judgment on this claim on the basis that there was insufficient evidence to support the claim because the Miners received a material benefit from the transaction.  The Court finds that if the Miners had a private cause of action for this claim, they did raise sufficient evidence to survive summary judgment, in that they alleged unconscionability on more grounds than just failure to receive a material benefit.

[30]266 Kan. 141 (1998).

20

that unconscionability under K.S.A. 16a-5-108 can only be used as a defense to the enforceability of contract, and does not create an independent cause of action.[31]

The Miners contend that *Gonzalez* was statutorily overruled by the 1999 amendment to K.S.A. 16a-2-401(9).  There is little question that the Kansas legislature amended K.S.A. 16a-2-401(9) in 1999 in order to address <u>one</u> of the holdings in *Gonzalez*.  Specifically, the Kansas Supreme Court in *Gonzales* also held that the practice of "loan flipping," where a creditor refinanced one of its own loans in a short period of time and charged addition prepaid finance charges, was not prohibited by the terms of the KCCC.  The court also specifically called on the Kansas legislature to amend the KCCC if this result was contrary to the policy it intended to enforce.

The Kansas legislature responded to that invitation and amended K.S.A. 16a-2-401(9) to address the practice of loan flipping.  Nothing in that 1999 amendment of the KCCC, however, addressed the other holding in *Gonzalez* that is applicable in this case – that a party does not have an independent private cause of action for unconscionability under K.S.A. 16a-5-108.  That holding in *Gonzalez* is still good law and clearly prohibits the Miners' fourth theory of recovery in this case.  Therefore, Beneficial is entitled to summary judgment on that claim.

**D.** **Beneficial is entitled to summary judgment on the Miners' eighth theory of recovery because the Miners do not have a private cause of action under RESPA for the failure to receive a proper good faith estimate.**

---

[31]*Id.* at 158-59.

The Miners' eighth theory of recovery is based upon an allegation that Beneficial failed to comply with the Real Estate Settlement Procedures Act ("RESPA"), in that Beneficial did not provide a good faith estimate of anticipated charges and costs in connection with the First Mortgage Loan. Alternatively, they argue that if such estimate was provided, it was not adequate and not in compliance with RESPA. In their response to Beneficial's summary judgment motion, the Miners' candidly concede that they do not have a private cause of action for this claim under RESPA and that summary judgment is appropriate.[32] Therefore, Beneficial is entitled to summary judgment on the Miners' eighth theory of recovery.

### E. Beneficial is entitled to summary judgment, in part, on the Miners' ninth theory of recovery based on fraud, but not as to the entire claim because there are material issues of fact concerning this claim.

The Miners' ninth theory of recovery is based on common law fraud, both as a result of intentional misstatements and intentional omissions of material facts. Beneficial contends that these claims are unsupported by facts and that it is, therefore, entitled to summary judgment.

"The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment."[33] In

---

[32] *See, e.g., Collins v. FMHA-USDA*, 105 F.3d 1366, 1368 (11th Cir. 1997) (holding that no private cause of action exists under 12 U.S.C. § 2604(c) for failure to provide a good faith estimate).

[33] *Crandall v. Grbic*, 36 Kan. App. 2d 179,

order to prove fraud by an intentional omission of a material fact, the Miners are required to prove that: (1) Beneficial had knowledge that the Miners did not have and that the Miners could not have discovered that information by the exercise of reasonable diligence; (2) Beneficial was under an obligation to communicate the true state of facts to the Miners; (3) Beneficial intentionally failed to communicate to the Miners the true state of facts; (4) the Miners relied upon Beneficial to communicate the true state of facts to them; and (5) the Miners sustained damages as a result of Beneficial's failure to communicate those facts.[34]

The Miners claim that Beneficial made the following untrue statements of fact and omissions of material fact in connection with the First Mortgage Loan:

1)      The "loan discount fees" would range between $2,725.00 and $2,825.00, when in fact, Beneficial charged $3,477.25 for such fees without first disclosing the increase to the Miners prior to the closing;

2)      The payments under the first and second mortgages would be less than the payments required under the Miners' existing debts, which assertion may or may not have been true, without also disclosing to the Miners that their payments would required over a much longer time period;

3)      That Beneficial failed to disclose that their debt would become secured debt, rather than unsecured debt, and that their equity in their home would be totally exhausted (and some) by the mortgage refinancing transaction;

4)      That Beneficial failed to disclose that the proposed credit life and disability policies were being underwritten by a related company, and further failed to disclose that such coverage could be obtained by the Miners, if they wanted it, through unrelated companies for considerably less money;

5)      That Beneficial failed to disclose that the Miners would not receive a refund or rebate of loan fees and/or insurance premiums already paid to Beneficial or

---

[34]PIK 3d 127.41; *Ensminger v. Terminix Intern. Co.*, 102 F.3d 1571 (10th Cir. 1996).

23

related companies through prior loans obtained by the Miners, which were being paid off by the mortgage refinancing;

6)      That Beneficial disclosed prepaid finance charges to the Miners that were limited by applicable Kansas law, but that Beneficial violated this law by failing to include the cost of the insurance premium in the prepaid finance charge quotation, since the insurance premium was being charged by a company related to or owned by Beneficial.

In addition, the Miners claim that Beneficial engaged in predatory lending practices by engaging in loan flipping, which is tantamount to fraud.[35]

The Court finds that the Miners' allegations regarding the alleged loan flipping do not constitute a cause of action for fraud. The basis for the loan flipping claim is that Beneficial engaged in a practice of making several loans over a short period of time in an effort to increase the amount of fees and prepaid interest charges paid to Beneficial. However, the Miners do not allege anywhere in the Pretrial Order, or in their memorandum in opposition to Beneficial's summary judgment motion, that Beneficial made any untrue statements of fact in relation to the alleged loan flipping.

The Miners do contend that the practices of Beneficial amount to predatory lending, which may be actionable under some other theory. However, unless Beneficial intentionally made some false statement of fact, or failed to disclose some material fact when required to do so in connection with their alleged predatory lending practices, there is no common law fraud claim under Kansas law. The actions complained of by the Miners may support a claim

---

[35]Pretrial Order, Doc. 54, Section 3.2.

under the Kansas Consumer Protection Act ("KCPA"),[36] the KCCC, or some other theory, but not common law fraud.

Although the Court has granted summary judgment on the issue of whether the alleged "loan flipping" constitutes common law fraud, the Court does find that the Miners have raised sufficient factual issues to survive summary judgment on the remaining fraud claim, including fraud through the omission of material facts. For example, if the Court construes all factual inferences in favor of the Miners, which it is required to do in deciding summary judgment motions, the Court finds that Beneficial's failure to inform the Miners that the effect of refinancing their personal loans and credit card debt through the First Mortgage Loan would be the conversion of unsecured debt into secured debt and the failure to disclose that the payments on many of those loans would be extended for a longer period of time could support a claim for fraud through omission.

Beneficial claims that the Miners should have been aware of these facts and that they could not have reasonably relied upon Beneficial to provide that information. Although this may very well be what the evidence in this case will establish at trial, the Court cannot rule, as a matter of law, in favor of Beneficial on this issue. What the Miners should have known, and whether they reasonably relied on Beneficial, are classic factual issues that are generally not properly disposed of on summary judgment.

---

[36]K.S.A. 50-623 *et seq.*

The Court finds that sufficient factual issues remain on the Miners' common law fraud claim to make summary judgment inappropriate.

**F.  The Miners' fourth, fifth, sixth and seventh theories of recovery are not barred by the statute of limitations.**

Beneficial claims the Miners' fourth, fifth, sixth and seventh theories of recovery, all of which are brought under the KCPA, are barred by the applicable one year statute of limitations.  The issue of the applicable statute of limitations for KCPA claims was addressed in *Alexander v. Certified Master Builders, Corp.*[37]  In *Alexander*, the Kansas Supreme Court held that when a plaintiff seeks to recover both damages and civil penalties under the KCPA, the action is governed by the three year statute of limitations found in K.S.A. 60-512(2) rather than the one year statute of limitations found in K.S.A. 60-514(c).

Beneficial claims that because the Miners are only seeking statutory penalties, and not actual damages, for Beneficial's alleged violations of the KCPA, the *Alexander* decision is inapplicable to this case and the Miners' claim is subject to the one year statute of limitations for claims based upon "[a]n action upon statutory penalty or forfeiture" found in K.S.A. 60-514(c).  Conversely, the Miners contend they are seeking both actual damages and statutory penalties, bringing their cause of action squarely within the holding of *Alexander*.

---

[37]268 Kan. 812 (2000).

The Court finds that Beneficial's position is not supported by the record. The Court entered the Pretrial Order on October 26, 2006.[38] In the section detailing the relief sought, the Miners list the following:

A. Recovery of costs incurred in the form of "loan discount fees" in connection with the refinancing totaling $3,477.25;

B. Recovery of other charges made by Beneficial in connection with the loan, including an appraisal fee in the amount of $340.00, title insurance in the amount of $398.00, and recording fees in the amount of $189.93;

C. Recovery of attorney fees in connection with the bankruptcy filing in the amount of $1,500.00;

D. Recovery for damages to their credit standing in the amount of $10,000.00;

E. A civil penalty not to exceed $10,0000.00 for each violation of the KCPA as allowed by K.S.A. 50-636;

F. A civil penalty not less than $100 and not more than $1,000 for each violation of the KCCC as allowed by K.S.A. 16a-5-201;

G. Recovery of punitive damages in the amount of $25,000.00; and

H. If the Plaintiffs prevail under the KCPA or the KCCC, recovery of attorney fees.

While acknowledging that the Miners have sought these other forms of relief in the Pretrial Order, Beneficial claims that "In the Pretrial Order, and the Complaint and the Amended Complaint filed by [the Miners], [the Miners] only request statutory damages in relation to the KCPA claim. [The Miners] have not sought to recover actual damages, as provided for

_____

[38]Doc. 54.

27

under the KCPA, K.S.A. 50-634. The fact that [the Miners] seek other damages under theories other than the KCPA, does not mean that Plaintiffs seek actual damages under the KCPA."

Although the Complaint and Amended Complaint do appear to limit the damages sought for violations of the KCPA to statutory penalties, the Pretrial Order supersedes those pleadings and controls the case.[39] "[T]he Pretrial Order should 'be liberally construed to cover any of the legal or factual theories that might be embraced by their language.'"[40] The pertinent section of the Pretrial Order is Section 8 - Relief Sought, which is set forth above.[41] At no point in Section 8 of the Pretrial Order do the Miners limit their claim for recovery under the KCPA to statutory penalties, or to any other cause of action for that matter. They provide a general list of remedies sought, which includes both actual damages and statutory penalties.

---

[39]*See Pruitt v. Kansas*, 364 F. Supp. 2d 1264, 1269 n.14 (D. Kan. 2005) (citing *Madrigal v. IBP, Inc.*, 21 F.3d 1121, 1121 (10th Cir. 1994)).

[40]*Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, ___ F. Supp. 2d. ____, 2007 WL 689584, *3 (D. Kan. 2007) (quoting *Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 818 (10th Cir.1979)).

[41]The Court does note that other portions of the Pretrial Order, such as the Plaintiffs' Narrative in Section 3.2, only mention statutory penalties in relation to the KCPA claims. However, Section 8 of the Pretrial Order is specifically designated as the section in which the Miners were to list all the relief they sought in this case, and they did not seek to limit their recovery under the KCPA to statutory penalties in that section. Consistent with the *Lohmann & Rausher* decision, above, the Court will liberally construe the Pretrial Order in this case.

28

Based on the language contained in Section 8 of the Pretrial Order, the Court finds that the Miners have sought both actual damages and statutory penalties for the alleged violations of the KCPA, and that the applicable statute of limitations is thus three years.[42]

### G. Beneficial is not entitled to summary judgment on the Miners' fifth theory of recovery because questions of fact remain as to whether Beneficial intentionally made false statements in violation of the KCPA.

The Miners' fifth theory of recovery alleges that Beneficial made certain representations to the Miners that were intentionally misleading or false, which constituted a deceptive act or practice in violation of the KCPA, specifically K.S.A. 50-626(b)(8). The Miners claim that Beneficial, through the mortgage documents, represented to the Miners that they would be required to pay a penalty if the loan was paid off early, which is prohibited by the KCCC, and that Beneficial would charge a fee for late payments, in an amount that is in excess of what is allowed by the KCCC.

Beneficial claims that the statements it made regarding the prepayment penalty and the late fee were not false or misleading because the statements are allowed by the AMTPA. As discussed in Section III-B, above, the Court finds that Beneficial, in the contract it drafted, opted to be governed by the KCCC and, based on that election, the AMTPA does

---

[42]Although the Court need not address the issue in this case based upon its ruling that the Miners were seeking both actual damages and statutory penalties, the Court would note that the *Alexander* decision did not directly address the current issue before the Court. Although *Alexander* did hold that when a plaintiff seeks both actual damages and statutory penalties the statute of limitations is three years, it did not go on to hold that when a plaintiff seeks only a statutory penalty that the one year statute of limitations would apply. The Court finds that decision should best be left to the Kansas Supreme Court to determine, especially where such a ruling is not necessary in this case.

29

not preempt state law in this case. Therefore, Beneficial's argument that the statements were not misleading or false, solely on the basis that the KCCC is inapplicable, must fail.

Beneficial also claims that even if the Court finds that the KCCC is applicable, Beneficial's statements regarding these loan provisions were not made knowingly or with reason to know of their falsity. "Issues of what is intentional or what is reckless misconduct are often difficult to resolve on a summary judgment motion."[43] In this case, Beneficial claims that it did not intentionally mislead the Miners because the case law on record shows that the KCCC was preempted by the AMTPA. However, the Court found cases that clearly do not support Beneficial's view of the law,[44] raising a question of fact as to whether Beneficial should have known that the KCCC was applicable in this case and thus the statements false.

The Court finds that a genuine question of fact remains on the material issue whether Beneficial's statements regarding the prepayment penalty and the late fees were intentional. This issue is not one that can be decided on summary judgment, and, therefore, Beneficial's summary judgment motion is denied as to the Miners' fifth theory of recovery

**H.** **Beneficial is entitled to summary judgment on the Miners' sixth theory of recovery because Beneficial did not make any false or misleading statements concerning the reduction of the Miners' monthly debt payments.**

---

[43]*Brooks v. Veterans Admin.*, 773 F. Supp. 1483, 1487 (D. Kan. 1991).

[44]*See, e.g. McCarthey*, 362 F.3d at 1011 and *Face*, 239 F.3d at 640, discussed in note 26.

30

The Miners claim that Beneficial willfully represented to them that their payments would be lower after the refinancing of the First Mortgage Loan, and that this representation was either an exaggeration, falsehood, or ambiguity of a material fact in violation of K.S.A. 50-626(b)(2). Beneficial has moved for summary judgment, claiming that the Miners' monthly payments were, in fact, reduced by the refinancing and that nothing about the statement was misleading or false. The Court agrees.

The First Mortgage Loan transaction was intended by both the Miners and Beneficial to refinance not only their existing mortgage, but to also consolidate other debts in an effort to reduce their monthly debt payments to those creditors, collectively, and to reduce the number creditors to whom they were required to make monthly payments. It is uncontroverted that the loan consolidation reduced the Miners' monthly debt payments by over $400 from the amount they were paying prior to the refinancing.

The Miners contend that the statements were misleading because they continued to use their credit cards after the First Mortgage Loan, which again increased their debt payments each month. The Miners also contend that Beneficial should have known they would incur additional credit card debt following the First Mortgage Loan closing and that Beneficial did not require the Miners to close any of their credit card accounts in connection with the refinancing of their home mortgage. Finally, the Miners claim that the statement made by Beneficial that their monthly debt payments would be reduced was false or misleading because many of the debts were relatively short term debts that were converted into long term debt, because Beneficial engaged in loan flipping by refinancing loans that

31

they had recently given to the Miners, and because Beneficial failed to advise the Miners that they would end up paying more in interest over the life of the refinanced loans than if they had not refinanced.

The Court finds that none of the arguments raised by the Miners demonstrate that the statement made by Beneficial at issue in this theory of recovery – that the Miners could reduce their debt payments by refinancing their debt through the First Mortgage Loan – show that the statement was false or misleading. The Miners got precisely what Beneficial said they would get, which was a reduction in their debt payments by approximately $400 a month and a reduction in the number of creditors to whom they would have to make monthly payments. The fact that the Miners then voluntarily incurred additional debt on their credit cards following the closing on this loan does not make the statement false or misleading when made. In addition, the arguments raised by the Miners concerning loan flipping and converting short term debt into long term debt, although possibly actionable under some of the Miners' other theories of recovery, do not negate the fact that the Miners did substantially reduce their monthly debt obligations by consolidating their debt in the First Mortgage Loan.

The Court finds there is insufficient evidence to create a question of fact on the Miners' sixth theory of recovery for a violation of K.S.A. 50-626(b)(2) and grants summary judgment to Beneficial on this claim.

I.    **Beneficial is not entitled to summary judgment on the Miners' seventh theory of recovery because questions of material fact remain as to whether Beneficial can be held liable for fraudulent conduct under the KCPA.**

32

The Miners' seventh theory of recovery is brought under the KCPA; they claim that Beneficial committed fraud in its dealings with the Miners, which violates K.S.A. 50-626(b). Both the Miners' claims and Beneficial's arguments for summary judgment in relation to the Miners' seventh theory of recovery essentially mirror those relating to the Miners' ninth theory of recovery for common law fraud, discussed in Section III-E, above. Essentially, the Miners are bringing their fraud claim under both Kansas common law and under the KCPA, and Beneficial moves for summary judgment on the same grounds for each claim. For the reasons set forth in Section III-E above, the Court also denies Beneficial's request for summary judgment on this claim based upon the issues of material fact that must be decided upon hearing the evidence in this case.

## IV.    CONCLUSION

Based upon the foregoing analysis, the Court grants Beneficial's summary judgment motion in part, and denies it in part. The Court finds that Beneficial is entitled to summary judgment on the Miners' first theory of recovery because the prepaid finance charges associated with the First Mortgage Loan were not in excess of those allowed under the KCCC.

The Court finds that Beneficial is not entitled to summary judgment on the Miners' second and third theories of recovery because Beneficial affirmatively elected to be bound by the KCCC rather than federal law, as allowed under the AMTPA, and the late fees and prepayment penalties provided for in the First Mortgage Loan contract violate Kansas law, by Beneficial's own admission.

33

The Court finds that the Miners' fourth, fifth, sixth and seventh theories of recovery are not barred by the applicable statute of limitations, as the Miners are seeking actual damages under the KCPA in addition to statutory penalties. The Court finds that Beneficial is entitled to summary judgment on the Miners' fourth theory of recovery because the Miners do not have a private cause of action for unconscionability under the KCCC (although if such a private cause of action did exist, summary judgment would not be appropriate under the facts of this case).

The Court finds that Beneficial is not entitled to summary judgment on the Miners' fifth theory of recovery because the KCCC is applicable in this case pursuant to the contract language drafted by Beneficial, and, therefore, the Court could find, based upon the evidence presented at trial, that Beneficial engaged in a deceptive act under K.S.A. 50-626(b)(8).

The Court finds that Beneficial is entitled to summary judgment on the Miners' sixth theory of recovery; there is no genuine issue of material fact that the Miners' monthly debt payments were reduced as a result of the First Mortgage Loan and that Beneficial did not willfully misrepresent this material fact in violation of K.S.A. 50-626(b)(2).

The Court finds that Beneficial is not entitled to summary judgment on the Miners' seventh theory of recovery and their ninth theory of recovery, except for that portion that deals with loan flipping. The Miners have raised sufficient material questions of fact to proceed to trial on their claims of fraud, including fraud through the omission of a material fact, which are brought both under the KCPA, K.S.A. 50-526, and Kansas common law. However, the Court does find that Beneficial is entitled to summary judgment on that portion

34

of the Miners' ninth theory of recovery that is based upon loan flipping, based on the fact that the Miners have failed to identify any material misstatements or omissions of material fact in regard to the loan flipping allegations.

The Court finds that Beneficial is entitled to summary judgment on the Miners' eighth theory of recovery because there is no private cause of action under RESPA for failing to comply with the requirement to issue a proper good faith estimate.

Based on these rulings, the Court finds that the Miners' second, third, fifth, and a portion of their seventh and ninth theories of recovery, have survived Beneficial's motion for summary judgment and the parties will proceed to trial on those claims.

**IT IS, THEREFORE, BY THE COURT ORDERED** that Beneficial Mortgage Company of Kansas, Inc.'s Motion for Summary Judgment[45] is granted in part and denied in part. Trial on the Miners second, third, fifth, seventh and ninth cause of actions[46] will be heard on the Court's stacked trial docket commencing **July 31 - August 1, 2007.**

**IT IS FURTHER ORDERED** that the foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.

---

[45]Doc. 59.

[46]The Miners second cause of action alleges a violation of the KCCC by charging an excessive prepayment penalty, the third cause of action alleges a violation of the KCCC by charging excessive late fees, the fifth cause of action alleges a violation of the KCPA by engaging in deceptive acts and practice regarding consumer rights and remedies, the seventh cause of action alleges a violation of the KCPA by engaging in fraud, and the ninth cause of action alleges common law fraud.

35

# # #

36